AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the

### Western District of New York

### United States of America

### v.

**Rasheem SULLIVAN aka Coop**
**Mario CAIN-HENRY, Jr. aka LO aka Love**
**Takir JOHNSON aka Strap aka Billionaire Strappa**
**Shatiara WILLIAMS**
**Jason RIVERA, Jr. aka Hota aka Logan**
**Brian HOLLEY aka Shad aka Skrilla aka Skrilla Santana,**

*Defendants*

Case No. 22-MJ- **739**

## CRIMINAL COMPLAINT

I, <u>Task Force Officer James Gashlin</u>, state that the following is true to the best of my knowledge and belief:

In or about and between January 2020 through December 2022, in the City of Rochester, Western District of New York, the defendants:

**did knowingly, willfully, and unlawfully combine, conspire, and agree, together and with others, to possess with intent to distribute marijuana and synthetic marijuana (commonly referred to as "K2"), Schedule I controlled substances, as well as cocaine, methamphetamine and fentanyl, Schedule II controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(A), all in violation of title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute, and distribute, controlled substances).**

This Criminal Complaint is based on these facts: **SEE AFFIDAVIT OF TFO JAMES GASHLIN.**

☒    Continued on the attached sheet.

_____
*Complainant's signature*
JAMES GASHLIN, Task Force Officer, DEA

Affidavit and Criminal Complaint submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed.R.Crim. P. 4.1 and 4(d) on:

Date: ___December 14, 2022___

City and State: __Rochester, New York__

_____
*Judge's signature*
MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

     -v-

Rasheem SULLIVAN aka Coop                                   22-MJ- *739*
Mario CAIN-HENRY, Jr. aka LO aka Love
Takir JOHNSON aka Strap aka Billionaire Strappa
Shatiara WILLIAMS
Jason RIVERA, Jr. aka Hota aka Logan
Brian HOLLEY aka Shad aka Skrilla aka Skrilla Santana

                Defendants.

---

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK  )
COUNTY OF MONROE  )  ss.:
CITY OF ROCHESTER  )

    I, JAMES GASHLIN, being duly sworn, depose and state:

    1.    I have been a Task Force Officer with the Drug Enforcement Administration since September 2018, and I am currently assigned to the DEA Rochester Resident Office. Prior to becoming a DEA Task Force Officer, I became a Police Officer with the Rochester Police Department in 2006. During my employment with the Rochester Police Department, I completed the Basic Course for Police Officers at the Monroe County Public Safety Training Center, located in Rochester, NY and four months of field training. This training included familiarization of the physical characteristics, packaging, and field testing of illegal drugs and narcotics. I served as a Police Officer with the Rochester Police Department, assigned to Patrol Division East, from the completion of that training until May 2013.

2.      In May 2013, I was promoted to the rank of Investigator and served in that position with the Rochester Police Department assigned to Patrol Division West Investigations, Clinton Section Investigations, Special Operations Section Tactical Unit Investigations, and Special Investigations Section.  As a Police Investigator, I also completed a temporary assignment in the Major Crimes Unit, Homicide Team.  During my career with the Rochester Police Department, I have attended numerous courses in criminal investigations and have had the opportunity to conduct, coordinate, and/or participate in a number of successful investigations involving burglaries, robberies, weapons possession, narcotics possession, narcotics sales, arsons, assaults, sexual assaults, larcenies, and homicides.  I have interviewed numerous defendants, victims, witnesses, and others who have been involved in or have knowledge of such crimes, including investigations relating to weapons and/or narcotics possession and/or sales.  I am familiar with the methods of use, effects, distribution, appearance, as well as the methods of manufacture of controlled substances.  I have been the affiant on multiple search warrants.

3.      During my time in the Special Investigations Section and the DEA Rochester Resident Office, I have participated in several long-term narcotics investigations that utilized the court-authorized interception of wire communications that resulted in the arrest of drug distributors and seizures of quantities of controlled substances and firearms.  I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the armed trafficking of illegal drugs.  In addition, I have had the opportunity to work with other experienced narcotics officers on the Local, State, and Federal levels that all possess varying levels of experience and who have all investigated drug distribution networks and individual distributors.  These narcotics officers have further provided your affiant with

2

a basis of knowledge and further educated your affiant on the various characteristics and/or methods of distribution of these trafficking organizations and/or individual distributors.

4.    This affidavit is submitted in support of a criminal complaint alleging that from between in or about January 2020 to in or about December 2022, in the City of Rochester, Western District of New York,   Rasheem SULLIVAN a/k/a "Coop" (hereinafter "SULLIVAN"), Mario CAIN-HENRY Jr. a/k/a "LO" a/k/a "Love" (hereinafter "CAIN-HENRY"), Takir JOHNSON a/k/a "Strap" a/k/a "Billionaire Strappa" (hereinafter "JOHNSON"), Shatiara WILLIAMS (hereinafter "WILLIAMS"), Jason RIVERA Jr a/k/a "Hota" a/k/a "Logan" (hereinafter "RIVERA"),  and Brian HOLLEY a/k/a "Shad" a/k/a "Skrilla Santana" a/k/a "Skrilla" (hereinafter "HOLLEY") and others, known and unknown, did knowingly, willfully, and unlawfully combine, conspire, and agree, together and with others, to possess with intent to distribute marijuana and synthetic marijuana (commonly referred to as "K2"),[1] Schedule I controlled substances, as well as cocaine, methamphetamine and fentanyl, Schedule II controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(A), all in violation of title 21, United States Code, Section 846.

5.    As more fully described below, the information in this affidavit is based upon my personal knowledge or upon information and believe, the source of which is my review

_____

[1]   K2 is a synthetic version of tetrahydrocannabinol (THC), the psychoactive ingredient in marijuana.  K2 is a mixture of plant material sprayed with synthetic psychoactive chemicals. K2 is also commonly referred to as "spice" or "deuce."

3

of reports and documents created in connection with this investigation, conversations with other law enforcement agents, my analysis of records and review of video/audio recordings pertinent to this case, records checks, and information received from confidential sources. The conclusions drawn in this affidavit are based on my training and experience, as well as on the advice of other experienced federal, state, and local narcotics investigators. Because this affidavit is being submitted for a limited purpose, I have not included each and every fact that I know concerning this investigation. Rather, I have set forth only those facts that related to the issue of whether probable cause exists to believe that RASHEEM SULLIVAN a/k/a "Coop," MARIO CAIN-HENRY JR a/k/a "L.O." a/k/a "Lo" a/k/a "Love," TAKIR JOHNSON a/k/a "Strap" a/k/a "Billionaire Strappa," Shatiara WILLIAMS, Jason RIVERA Jr a/k/a "Hota" a/k/a "Logan",  and Brian HOLLEY a/k/a "Shad" a/k/a "Skrilla Santana" a/k/a "Skrilla" have committed the specified offenses.

## BACKGROUND OF INVESTIGATION

6.      The Rochester Police Department (RPD) and the Drug Enforcement Administration (DEA) (collectively "the investigative team") have been investigating the illegal narcotics activity of Rasheem SULLIVAN ("SULLIVAN"), along with his associates, to include Mario CAIN-HENRY Jr., Takir JOHNSON, Shatiara WILLIAMS, Jason RIVERA Jr., Brian HOLLEY and several others not currently named or identified in this affidavit.   Collectively, the SULLIVAN Drug Trafficking Organization (DTO) group operates much like an open-air pharmacy, responsible for the distribution of a wide range of controlled substances, including cocaine, crack cocaine, fentanyl, methamphetamine,

4

marijuana, synthetic marijuana (K2), prescription narcotics and other controlled substances, all in the Rochester, New York area.

7.    The principle residences and/or buildings associated with the SULLIVAN DTO include, but are not limited to:  19 Maria Street; 52 Lime Street; 233 Fourth Street; 441 Avenue D; 1740 Monroe Avenue; 118 Frost Avenue; and, 888 South Clinton Avenue – all located in the city of Rochester, Western District of New York.

8.    Apart from the narcotics trafficking, during the summer of 2022, several violent acts occurred in Rochester, NY, namely shootings and arsons.  During this time frame, members of law enforcement learned that there was an ongoing feud between two groups of drug dealers.  One of these groups is led by SULLIVAN, a member of the "Bloods," a nationally recognized gang, and the other led by Brandon Washington a/k/a "B Mack."

## PROSPECTIVE DEFENDANTS

9.    **Rasheem SULLIVAN** has the following relevant criminal history:

a. On December 11, 2013, in Monroe County Court, SULLIVAN was convicted upon plea of guilty to Attempted Assault in the First Degree, a felony, and was sentenced to a term of 42 months in prison followed by 30 months of post-release supervision.

10.    **Mario CAIN-HENRY Jr**. has the following relevant criminal history:

a. On September 30, 2020, in Monroe County Court, CAIN-HENRY was convicted upon plea of guilty to Attempted Criminal Possession of a Controlled Substance in the Seventh Degree, a misdemeanor, and was sentenced to time served.

5

11.    **Takir JOHNSON** has no relevant criminal history.

12.    **Shatiara WILLIAMS** has no relevant criminal history.

13.    **Jason RIVERA Jr**. has the following relevant criminal history:

   a. On March 16, 2022, in Monroe County Court, RIVERA was convicted upon plea of guilty to Criminal Possession of a Controlled Substance in the Seventh Degree, a misdemeanor, and was sentenced to conditional discharge.

14.    **Brian HOLLEY** has the following relevant criminal history:

   a. On September 29, 2016, in Monroe County Court, HOLLEY was convicted upon plea of guilty to Criminal Sale of a Controlled Substance in the Third Degree, a felony, and sentenced to 30 months incarceration followed by 18 months followed by 18 months of post-release supervision.

   b. On February 9, 2012, in Monroe County Court, HOLLEY was convicted upon plea of guilty to Criminal Sale of a Controlled Substance In or Near School Grounds, a felony, and sentenced directly to two years parole.

## CONFIDENTIAL SOURCE INFORMATION

15.    During the course of this investigation, the investigative team has used confidential sources to advance the investigation. These sources have provided intelligence and/or have conducted controlled purchases and/or have had monitored conversations with targets of the investigation. Information received from and actions taken by confidential

sources have been corroborated whenever possible by the investigative team through various investigative techniques.

16.    Confidential Source 1 (hereinafter "CS-1") is personally known to the DEA and the RPD.  CS-1 has cooperated with law enforcement for over two years.  CS-1's cooperation began pursuant to a plea agreement in exchange for consideration at sentencing. Since commencing his/her cooperation, CS-1 has provided reliable information relative to narcotics trafficking which has been substantially corroborated through independent investigation, consensual recordings of face-to-face conversations, and controlled purchases of narcotics that led to the seizure of narcotics.  The identity of CS-1 is being withheld from this affidavit to protect CS-1 from retaliation because CS-1 is an active cooperating source. CS-1 indicated that the information he/she provided was based upon either personal observations or personal conversations directly with the individuals involved.

17.    Confidential Source 2 (hereinafter "CS-2") is personally known to the DEA and the RPD.  CS-2 has cooperated with law enforcement for over three years.  CS-2's cooperation began pursuant to a plea agreement in exchange for consideration at sentencing. Since commencing his/her cooperation, CS-2 has provided reliable information relative to narcotics trafficking which has been substantially corroborated through independent investigation, consensual recordings of face-to-face conversations, and controlled purchases of narcotics that led to the seizure of narcotics.  The identity of CS-2 is being withheld from this affidavit to protect CS-2 from retaliation because CS-2 is an active cooperating source. CS-2 indicated that the information he/she provided was based upon either personal observations or personal conversations directly with the individuals involved.

**DRUG HOUSE # 1 - 19 MARIA STREET**

7

18.     The residence at **19 Maria Street, Rochester, New York** has been known to law enforcement as an illegal drug sales location associated with the SULLIVAN DTO. Specific incidents and/or information related to 19 Maria Street include the following:

a.      On February 9, 2022, members of the RPD SIS and Major Crimes Unit (MCU) lawfully executed a search warrant at 19 Maria Street. Evidence located and seized during this search warrant included a quantity of K-2, a quantity of marijuana, a quantity of pills/tablets, digital scales and materials commonly used for drug packaging, and U.S. Currency. Z.H.[2] was the sole occupant of the residence at the time of this search warrant.

b.      On March 29, 2022, members of the RPD SIS lawfully executed a search warrant at 19 Maria Street. Evidence located and seized during this search warrant included a quantity of suspected Marijuana, a quantity of K-2, a quantity of pills/tablets, digital scales, and a quantity of U.S. Currency. Located inside the residence at the time of the search warrant were Brian HOLLEY and N.M.[3]. No arrests were made at the time pending a return of laboratory reports from the Monroe County Crime Laboratory.

c.      Items located and seized from 19 Maria Street on March 29, 2022 were recently tested at the Monroe County Crime Laboratory:

---

[2] Z.H.'s full name is known to agents, but his/her name is being withheld from this affidavit because he/she is not being charged at this time.
[3] N.M.'s full name is known to agents, but his/her name is being withheld from this affidavit because he/she is not being charged at this time.

i.   332 small clear jars with pink lids containing a green leafy substance (synthetic marijuana or K2) were located in the kitchen. The Monroe County Crime Laboratory examined a sample with an aggregate weight of 1.429 grams +/- 0.001 grams, which revealed that fentanyl was contained in the sample. The remaining 321 materials (including packaging) had an aggregate weight of 2,001 grams +/- 2 grams.

ii.   175 red and pink bags containing a green leafy substance (synthetic marijuana or K2) were located in the kitchen. The Monroe County Crime Laboratory examined a sample with an aggregate weight of 2.77 grams +/- 0.03 grams, which revealed that fentanyl was contained in the sample. The remaining 174 materials (including packaging) had an aggregate weight of 799 grams +/- 2 grams.

iii.   72 bags of various designs containing a green leafy substance (synthetic marijuana or K2) were located in a large Ziploc-style bag in the kitchen. The Monroe County Crime Laboratory examined a sample with an aggregate weight of 4.52 grams +/- 0.03 grams, which revealed that fentanyl was contained in the sample. The remaining 71 materials (including packaging) had an aggregate weight of 502.70 grams +/- 0.03 grams.

iv.   106 tablets of various shapes and colors. The Monroe County Crime Laboratory examined 28 randomly selected samples, which revealed the presence of methamphetamine. The aggregate weight of the 106 tablets was approximately 39 grams.

d.      On April 1, 2022, in the aftermath of the search warrant conducted there,

uniformed officers of the RPD responded to 19 Maria Street to assist with securing

the location.  Reports were also received that a vehicle was parked at the location

with at least one person inside.  Upon arrival, officers observed a vehicle registered to

CAIN-HENRY's sister, Diamonds Cain-Henry, at 147 Boxart Street, Rochester,

New York.  Officers spoke with a male who stated he was working on the location

with property management.  This male went into the location to get his "boss" to

speak with RPD.   CAIN-HENRY exited the location and informed officers he was

there to make repairs.  He stated he was working for a person that he named as

"Syed." [4]

## RECENT NEW YORK STATE ARREST OF BRIAN HOLLEY RELATIVE TO SEARCH WARRANT AT 19 MARIA STREET

19.    Based upon the recently released report from the Monroe County Crime

Laboratory, which indicated the presence of methamphetamine and fentanyl in the

substances seized from 19 Maria Street on March 29, 2022, a decision was made to place

HOLLEY in custody.  On December 1, 2022, Brian HOLLEY was observed driving a black

Dodge Charger, bearing New York State registration KJF7400.  This vehicle is registered to

Rasheem SULLIVAN's mother at 36 Weyl Street, Rochester, New York.  During the course

---

[4]     According to publicly available records from Monroe County, an individual named
Syed Hussain, dba "Cosy Homes Properties, LLC.", is the owner of several SULLIVAN
DTO properties, including 19 Maria Street, 233 Fourth Street, 52 Lime Street, and 118
Frost Avenue, each of which is discussed below.

of this investigation, SULLIVAN has been observed driving this vehicle on a regular basis. Furthermore, it has been observed parked at his residence at 5 Elmdorf Avenue. HOLLEY was stopped in the vehicle, placed under arrest and transported to the RPD Public Safety Building.

20.    After knowingly and voluntarily waiving his rights under *Miranda*, HOLLEY initially denied any knowledge of the drugs that were found in 19 Maria Street. Upon being confronted with additional information, HOLLEY advised, in sum and substance, the following: 19 Maria Street was in fact a drug sales location for a person HOLLEY knows as "Coop" (and known by the investigative team to be SULLIVAN). He stated that the other person found with him inside 19 Maria Street on March 29th was SULLIVAN's cousin, a female by the name of N.M., whom Brian Holley was dating at the time. HOLLEY indicated that both he and N.M. sold from the location. HOLLEY advised that SULLIVAN travels out of town to obtain large supplies of K2, which he will then mix with "dope," which HOLLEY said was a "powder" (believed to be the fentanyl found to be mixed in with the synthetic marijuana).

21.    HOLLEY further advised that N.M.'s house on Saint Paul Street is used to bag up K2 and has been used as a stash spot. (The investigative team knows that N.M. resides at 1582 Saint Paul Street – Apartment 3. This apartment building encompasses the addresses of 1580-1586 Saint Paul Street, and the investigative team also knows that Akeem Sullivan, brother of Rasheem Sullivan, also resides in this building, specifically 1580 Saint Paul Street – Apartment 1. Beach Street runs perpendicular to Saint Paul St.).

22.    HOLLEY further advised that SULLIVAN also has drug houses at 233 Fourth Street and 441 Avenue D and works with a male that goes by the name "LO" (known by the

11

investigative team to be CAIN-HENRY). HOLLEY advised that SULLIVAN is primarily responsible for the K2 and CAIN-HENRY is primarily responsible for the pills, cocaine, and crack cocaine, but they sell everything together. HOLLEY also advised that he has picked up drugs from SULLIVAN and brought them to the houses where they are sold, and has brought money from the houses back to SULLIVAN in the past.

23.     HOLLEY also advised that SULLIVAN had been in a feud with a male known as "B-Mack" (known by the investigative team to be Brandon Washington, who is currently charged with federal drug trafficking under 22-MJ-677MJP). HOLLEY described that this feud involved incidents of violence, namely shootings and arsons, back and forth between SULLIVAN's group and "B-Mack's" group. HOLLEY said that this feud is what resulted in the police officers getting shot (referring to the shooting of RPD Officer Anthony Mazurkiewicz and RPD Officer Sino Seng, resulting in the murder of Officer Mazurkiewicz) on July 21, 2022. HOLLEY added that there was also another shooting that took place earlier that day between these groups.

## DRUG HOUSE # 2 - 233 FOURTH STREET

24.     The house at **233 Fourth Street, Rochester, New York,** has also been known to law enforcement as an illegal drug sales location being operated by the SULLIVAN DTO. This location has been associated with acts of violence and illegal drug sales throughout this time. Specific incidents include the following:

   a.   On June 23, 2020, members of the Rochester Police Department (RPD) Special Investigations Section (SIS) lawfully executed a search warrant at 233 Fourth Street. Evidence located and seized during this search warrant included

12

approximately 4.75 pounds of marijuana, approximately 6 grams of fentanyl, and $2,227.00 U.S. Currency. Five people were located inside the residence at the time of this search warrant, including Marlon Dawson a/k/a "Bop," a known associate of SULLIVAN. Ultimately the case against Dawson was no billed in state grand jury.

b.  On July 14, 2020, members of the RPD SIS lawfully executed a search warrant at 233 Fourth Street. Evidence located and seized during this search warrant included approximately 6 pounds of marijuana, small amounts of cocaine and fentanyl, and $7,553.00 U.S. Currency. Five people were located inside the residence at the time of this search warrant, including Mario CAIN-HENRY. Ultimately, CAIN-HENRY plead guilty to Criminal Possession of a Controlled Substance 7th.

c.  On July 23, 2020, members of the RPD investigated an incident involving gun shots being fired in the vicinity of 233 Fourth Street. Agents learned that this incident was captured by a nearby surveillance camera. Agents reviewed this video, which depicts SULLIVAN walking from 233 Fourth Street to a white SUV parked in the street. While SULLIVAN was sitting in the driver's seat of the parked SUV, an unidentified individual approached the SUV from the west and drew what appeared to be a gun from his waistband. A handgun was then observed protruding from the driver's window of the SUV. SULLIVAN drove the SUV north while firing the handgun. As the SUV drove north, the rear window shattered. The SUV continued traveling north until it crashed into a parked vehicle. SULLIVAN then exited the driver's seat through the window and

13

an object can be seen falling to the ground. This object was ultimately located and collected by members of the RPD and was observed to be a wallet containing SULLIVAN's identification. Multiple spent 9mm casings were located on the side of the street where SULLIVAN was parked in the SUV. Members of RPD also located a quantity of K-2 and a quantity of new/unused baggies inside the SUV that are consistent with those used in the sale of illegal drugs and marijuana.

d. Additionally, members of the RPD located what appeared to be blood inside the vehicle driven by SULLIVAN and a sample was collected. On December 8, 2022, the investigative team received information from the Monroe County Crime Laboratory regarding the suspected blood located in the vehicle driven by SULLIVAN on July 23, 2020. This information revealed that DNA testing performed on the sample of suspected blood recovered from this vehicle matched the DNA of SULLIVAN.

e. On July 27, 2020, uniformed officers of the RPD observed a male, later identified as Jason RIVERA, conduct a hand-to-hand drug transaction near 233 Fourth Street. RPD Officers stepped out and attempted to speak with RIVERA, who fled the area on foot. While fleeing, Jason RIVERA, Jr., discarded three bags of marijuana and was also found to possess a quantity of suspected Alprazolam pills. At this time, officers documented that RIVERA's residence was listed as 233 Fourth Street with Rochester Gas and Electric (RG&E). RIVERA was not arrested, and officers turned property in for destruction.

f. In July of 2021, members of the RPD made efforts to locate SULLIVAN in relation to the "shots fired" incident. During these efforts, officers spoke to a

concerned citizen[5], who informed officers that SULLIVAN is an active "Bloods" gang member, operates a "trap house" (common term used to describe a residence utilized for the sale of illegal drugs) on Maria Street, and hangs out on Fourth Street. Thereafter, Officers located a vehicle parked behind 19 Maria Street, which was registered to SULLIVAN's mother. Officers returned to 19 Maria Street and found this vehicle was no longer there, and then located the vehicle parked behind 233 Fourth Street. The following day, officers located this same vehicle at 36 Weyl Street (the residence of SULLIVAN's mother) and observed SULLIVAN depart 36 Weyl Street driving this vehicle.

### Recent Controlled Purchases From 233 Fourth Street Demonstrate the Location Remains Active

25.    On November 16, 2022, a member of the law enforcement, acting in an undercover capacity (UC), made a controlled purchase of crack cocaine from 233 Fourth Street. The UC was provided with U.S. Currency (official funds) and a KEL/recording device to make the purchase. The UC then traveled to 233 Fourth Street and walked up the driveway toward the last door on the south side of the residence. The UC observed two males speaking by this doorway, one inside the doorway and the other standing next to the steps leading to the door. The UC observed the male standing next to the steps leading to the door hand the male in the doorway U.S. Currency. The UC then observed the male in the doorway hand the male standing next to the steps leading to the door a quantity of small clear Ziploc-

---

[5]    The concerned citizen's identity, address and contact information are known to law enforcement, but is being withheld from this affidavit for safety concerns.

style bags. The male who received these bags then walked away and the UC approached the male in the doorway.

26.     When the UC approached the male in the doorway, he/she handed the male $20.00 U.S. Currency (official funds). The male held up one finger to the UC, indicating that he wanted the UC to wait. The male then walked into the residence out of the UC's view and then returned a moment later. The male handed the UC four small Ziploc-style bags containing a white chunky substance consistent with the appearance of crack cocaine, and the UC then left the location. A drug field test was conducted on a sample taken from the suspected crack cocaine purchased by the UC. This field test did yield a positive result for the presence of cocaine.

27.     Within the last 14 days, members of the investigative team met with CS-1 to formulate plans for an additional controlled purchase from 233 Fourth Street. CS-1 was searched both before and after the controlled purchase for contraband, both with negative results. CS-1 was provided with U.S. Currency and a KEL/recording device to make the purchase. Agents drove CS-1 to the vicinity of 233 Fourth Street and observed CS-1 approach the location on foot. Moments later, CS-1 was observed by agents returning to the vehicle. When CS-1 returned to the vehicle, he/she turned over the KEL/recording device and one pouch containing a green plant-like material with the words "gas house" written on it. This substance was observed to be consistent in appearance to K2.

28.     CS-1 advised that he/she walked up the side of 233 Fourth Street towards the back. CS-1 further advised that as he/she neared the rear of the residence he/she observed a doorbell adjacent to one of the windows. CS-1 advised ringing the doorbell and having a brief conversation with an unknown male voice through the window. CS-1 advised that he/she

16

could not see the male's face through the window. CS-1 advised that he/she requested to purchase a quantity of K2 and a quantity of crack cocaine, but was told by the individual inside the house that they were out of crack cocaine and were expecting to have more in approximately 30-40 minutes. CS-1 advised that he/she then handed the individual inside the house $20.00 U.S. Currency through the window, and in exchange the individual handed CS-1 the pouch of suspected K2 that CS-1 had requested to purchase. CS-1 also advised that he/she observed a board with prices written on it for various amounts of K2, marijuana, and "beans" (your affiant knows this term to be commonly used when referring to pills). CS-1 advised that he/she then returned directly to the vehicle.

29.    During the time surrounding this controlled purchase at 233 Fourth Street on December 1, 2022, the investigative team reviewed GPS/location data received regarding Takir JOHNSON's cellular telephone was consistent with the device being in the area of 233 Fourth Street at the time of the controlled purchase.

30.    Within the last 14 days, members of the investigative team met with CS-2 to formulate plans for another controlled purchase from 233 Fourth Street. CS-2 was searched both before and after the controlled purchase for contraband, both with negative results. CS-2 was provided with U.S. Currency and a KEL/recording device to make the purchase. Agents drove CS-2 to the vicinity of 233 Fourth Street and observed CS-2 approach the location on foot. Moments later, CS-2 was observed by agents returning to the vehicle. When CS-2 returned to the vehicle, he/she turned over the KEL/recording device and five pouches containing a green plant-like substance, which was consistent with the appearance of K2.

31.    CS-2 advised that he/she walked up the driveway toward the back of the house and went to a door. A male answered this door and at about the same time another male

17

opened the door further toward the back of the house. CS-2 had a brief interaction with the male at the further back door. CS-2 advised asking this male to purchase "beans" (referring to pills), however the male informed CS-2 that they did not have any at that time. CS-2 then had a brief conversation with the male about purchasing "deuce" (referring to K2). The male entered the residence and returned to CS-2 a moment later. CS-2 advised handing the male $100.00 U.S. Currency (official funds), and in exchange the male handed CS-2 five pouches containing suspected K2. CS-2 advised that he/she walked directly back to the vehicle afterward.

32.    During the times surrounding this controlled purchase, information reviewed from the GPS/location information relative to CAIN-HENRY and JOHNSON's cellular telephone was consistent with the devices being in the area of 233 Fourth Street at the time of this controlled purchase.

## DRUG HOUSE # 3 - 52 LIME STREET

33.    On January 7, 2022, members of the RPD SIS lawfully executed a search warrant at **52 Lime Street**. Located at the residence at the time of the search were Jason RIVERA, Jr., and two other individuals. Evidence located and seized during this search warrant includes a quantity of crack cocaine, approximately 13.4 grams of methamphetamine, approximately 2.4 grams of fentanyl, approximately 6 grams of cocaine, digital scales and other materials consistent with those commonly used in the processing/packaging of narcotics, a quantity of ammunition. Additionally, the keys to the location were found in Jason RIVERA's possession. Ultimately, RIVERA plead guilty to Criminal Possession of a Controlled Substance 7th.

## DRUG LOCATION # 4 - 1740 MONROE AVENUE

34.     Members of the DEA and Brighton Police Department (BPD) conducted an investigation into illegal marijuana sales being conducted at 1740 Monroe Avenue, a location known as "Top Shelf Tees."    A public records search revealed that the location had a dba filed by CAIN-HENRY, with a renter known as Garrett Dunne.  In March of 2022, a member of law enforcement acting in an official undercover capacity (hereinafter UC-1) , went to 1740 Monroe Avenue.  While inside, UC-1 met with an individual identified as Dunne.  During this interaction, UC-1 was given a free sample of THC edibles by Dunne.    Dunne also provided UC-1 his phone number (585-629-8873).  In April of 2022, surveillance conducted during this investigation also observed CAIN-HENRY and Dunne arriving at 1740 Monroe Avenue together and opening the door with a set of keys.

35.     Three days later in April of 2022, UC-1 again went to 1740 Monroe Avenue to attempt to purchase controlled substances, where he/she met with an individual who identified himself as "Logan."  "Logan" was identified as Jason RIVERA.  During this interaction, Jason RIVERA did provide UC-1 with pricing for future purchases of marijuana and other products containing THC.

36.     On April 19, 2022 members of the DEA and BPD executed a lawful search warrant at 1740 Monroe Avenue.  M.D.[6] was found to be the sole occupant at the time of the search warrant.    Evidence  located  and  seized  during  this  search  warrant  included

_____

[6] M.D.'s full name is known to agents, but his/her name is being withheld from this affidavit because he/she is not being charged at this time.

19

approximately 236 grams of marijuana along with documents in CAIN-HENRY's name. The shop was thereafter closed down and the tenants left the business plaza. No criminal charges were filed.

## DRUG HOUSE # 5 – 441 AVENUE D

37.    The location at **441 Avenue D** is a relatively new drug location for the SULLIVAN DTO. Within the last month, the investigative team was able to make several controlled purchases of controlled substances. For example, on November 3, 2022, the investigative team utilized a paid CS to attempt to make a purchase of narcotics from 441 Avenue D. During this controlled purchase at 441 Avenue D, the CS did purchase quantities of cocaine, crack cocaine, suspected K2, and suspected Xanax, which was all turned over to members of the investigative team. The CS informed the investigative team that he/she was told by the occupants of 441 Avenue D that he/she had just purchased the last of the crack cocaine.

38.    After learning from the CS that the supply of crack cocaine was gone, members of the investigative team established surveillance to observe whether the house would be resupplied. At approximately 6:48 p.m., a white Chevrolet Malibu, bearing Florida registration 95BKAZ, a rental vehicle rented by Garrett Dunne, but utilized primarily by CAIN-HENRY and RIVERA during the timeframe of the rental, was observed parked at 441 Avenue D. At approximately 7:51 p.m., this Chevrolet Malibu was observed departing. Surveillance was maintained on the vehicle as it traveled to 888 South Clinton Avenue. 888 South Clinton is a hair salon business known as the "Entourage Beauty Bar." The vehicle parked in the rear at approximately 8:01 p.m. At approximately 8:06 p.m., Jason RIVERA

was observed exiting the "Entourage Beauty Bar" and departing in this Chevrolet Malibu. Surveillance was maintained until the Chevrolet Malibu arrived at 233 Fourth Street. The Chevrolet Malibu remained at 233 Fourth Street for approximately 22 minutes before departing and traveling to 441 Avenue D, arriving at approximately 8:47 p.m..

39.    As will be further articulated below, it is believed that CAIN-HENRY is utilizing the Entourage Beauty Bar as a location to store additional supplies of controlled substances, either with or without the knowledge of the hair salon owners. In this instance, it is believed that RIVERA travelled to the Entourage Beauty Bar to pick up additional controlled substances, then delivered them to the drug houses located at 233 Fourth Street and 441 Avenue D. See ¶¶ 95-96, below, for more information relative to this address.

40.    Later that evening, after it appeared that the location had been re-supplied with crack cocaine, a member of law enforcement, acting in an undercover capacity (UC), conducted a controlled purchase of crack cocaine from 441 Avenue D. The UC was provided with U.S. Currency (official funds) and a KEL/recording device to make the purchase. The UC then traveled to 441 Avenue D and walked onto the porch on the southeast corner of the residence. The UC observed an opening cut into a board on a lower window sash, and observed there to be a flap covering the hole. The also UC observed a doorbell mounted to this window. The UC rang the doorbell and could hear a male's voice talking inside the residence. The UC was asked if he/she wanted "hard" (common term used to refer to crack cocaine), and the UC replied that he/she did. The male informed the UC that they had "dubs" and "dimes" for sale (common terms used to refer to bags containing quantities of illegal drugs worth $20.00 and $10.00 respectively). The UC asked for 2 "dubs" and 2 "dimes" and handed the male $60 U.S. Currency (official funds) through the window, and in

21

exchange the male passed the UC 4 small clear Ziploc-style bags through the window. The UC observed these bags to contain a white chunky substance consistent with the appearance of crack cocaine, later field testing positive for the presence of cocaine.

41.    During the first week of December 2022, CS-1 was utilized again in an attempt to make a controlled purchase of narcotics from 441 Avenue D. CS-1 was searched both before and after the controlled purchase for contraband, both with negative results. CS-1 was provided with U.S. Currency and a KEL/recording device to make the purchase. Agents drove CS-1 to the vicinity of 441 Avenue D and observed CS-1 approach the location on foot. Moments later, CS-1 was observed by agents returning to the vehicle. When CS-1 returned to the vehicle, he/she turned over the KEL/recording device, one green pouch containing a green plant-like material, and four small clear Ziploc-style bags containing a white chunky substance. The substance in the green pouch was observed to be consistent in appearance to K2, and the substance in the small clear Ziploc-style bags was observed to be consistent with the appearance of crack cocaine.

42.    CS-1 advised that he she approached 441 Avenue D and walked up the driveway toward a porch at the back corner of the residence. CS-1 advised seeing a window with a board on it at this window. CS-1 advised interacting briefly with an unknown male with lighter skin through this window. CS-1 advised that during this interaction, he/she requested to purchase a "dub" of K2 and a "dub" of crack cocaine (meaning $20.00 quantities of each substance). CS-1 advised that he/she handed $40.00 (official funds) to the male through the window and in exchange received one green pouch of suspected K2 and 4 clear Ziploc-style bags of suspected crack cocaine. CS-1 further advised that he/she requested to

purchase Xanax from the male as well, however the male told CS-1 that they did not have any Xanax at the time.

43.    A drug field test was conducted on a sample taken from the suspected crack cocaine in the clear Ziploc-style bags purchased by CS-1, which yielded a positive result for the presence of cocaine.  During the time frame of this controlled purchase, GPS/location data relative to CAIN-HENRY's and RIVERA's cellular telephones were consistent with the devices being located in the area of 441 Avenue D.

44.    Within the last two weeks, CS-2 was also utilized to conduct additional controlled purchases at 441 Avenue D.  CS-2 was searched both before and after the controlled purchase for contraband, both with negative results.  CS-2 was provided with U.S. Currency and a KEL/recording device to make the purchase.  Agents drove CS-2 to the vicinity of 441 Avenue D and observed CS-2 approach the location on foot.  Moments later, CS-2 was observed by agents returning to the vehicle.  When CS-2 returned to the vehicle, he/she turned over the KEL/recording device and one small clear Ziploc-style bag containing a white chunky substance, which was consistent with the appearance of crack cocaine.

45.    CS-2 advised that he/she walked up the driveway toward the back of the house and observed a window on the porch there.  CS-2 advised speaking to an unknown male through the window.  CS-2 advised that the male told him they did not have any "bars" (referring to Xanax) or "boy" (referring to heroin/fentanyl), but said that they would have more "bars" the following day.  CS-2 then advised having a brief conversation with the male about "hard" (referring to crack cocaine).  CS-2 advised purchasing one clear Ziploc-style bag of suspected crack cocaine from the male through the window in exchange for $100.00 U.S. Currency (official funds).  A drug field test was conducted on a sample taken from the clear

23

Ziploc-style bag of suspected crack cocaine, which yielded a positive result for the presence of cocaine.

## ARREST OF SULLIVAN AND SUBSEQUENT SEARCH WARRANT CONDUCTED ON SULLIVAN's CELLULAR TELEPHONE  585-520-6534

46.     On October 14, 2022, members of the New York State Police (NYSP) became involved with a vehicle pursuit with the black Dodge Charger, bearing New York State registration KJF7490, registered to SULLIVAN's mother.   The vehicle was ultimately stopped and SULLIVAN was found to be the driver and sole occupant.   SULLIVAN was also found to be in possession of hundreds of suspected Xanax pills, which were packaged in a manner indicative of SULLIVAN having intent to sell them.   More importantly, SULLIVAN was also found to be in possession of a business card that read "Pack In Action 24hrs free (K2 & Weed) 441 Ave D."   Of course, as stated above, 441 Avenue D is one of the SULLIVAN DTO's drug houses.   A subsequent lab report from the Monroe County Public Safety Laboratory confirmed that the pills were in fact prescription Xanax.

47.     SULLIVAN was also found to be in possession of two cellular telephones. While SULLIVAN was in custody overnight, a search warrant was immediately obtained to examine the two cellular telephones.   One cell phone was unable to be opened.   A second cellular telephone, a white iPhone 13 Pro Max in a black case, that was found on SULLIVAN's person, was opened and searched pursuant to the warrant.   After the execution of the search warrant, the cellular telephone number for the phone was determined to be 585-520-6534.

48.    During the examination of this cellular telephone, it was observed that SULLIVAN utilized an application called "Telegram" to send/receive messages with other individuals.  "Telegram" is an end-to-end encryption App that allows participants to privately communicate with each other through a variety of means, including texts.  It was further observed that SULLIVAN utilized at least two usernames, including "John Doe" and "Erica Smith."

49.    At the time of the seizure, several pertinent communications remained on the cell phone and were downloaded pursuant to the search warrant.  The communications were clearly related to narcotics trafficking and the associates with whom SULLIVAN participated. For example:

a.  A conversation between "Erica Smith" and a person with the username "Skrillah Santana" (known to be Brian HOLLEY) was observed on "Telegram" on October 13, 2022.  The conversation read as follows:

Outgoing Image from "Erica Smith" to "Skrillah Santana" (SS):

telegram-cloud-photo-size-15064592652414069375-y (*Observed to be a picture depicting a business card, written on the card was: "Pack In Action 24hrs Free (K2 & Weed) 233 first st"*)
Outgoing call from Erica Smith to SS – duration: 239 seconds
Incoming call to Erica Smith from SS – duration: 288 seconds
Cancelled call
Incoming Message to Erica Smith from SS: Calls still
Incoming call to Erica Smith from SS – duration: 0 seconds
Outgoing call from Erica Smith to SS – duration: 13 seconds
Incoming call to Erica Smith from SS – duration: 161 seconds
Outgoing Image from Erica Smith : telegram-cloud-photo-size-1-506474930705122365-y (*Observed to be a picture depicting an order confirmation for 250 business cards which read: "Pack Back In free (K2 & Weed) 233 fourth st." and showing the order would be ready October 14, 2022 at 8:30 pm at Staples, 1370 W. Ridge Rd with a pick-up person listed as "B Holly"*)

25

b. A conversation between "John Doe" and the username "Sav" (known to be Evion Smith) was also observed on Telegram on October 13, 2022, during the same timeframe as the above conversation between "Erica Smith" and "Skrillah Santana." The conversation reads as follows:

John Doe: Don't pass them cards out
Sav: Bet
John Doe: Shad put the wrong address
Sav: Yeah first street who over dere
John Doe: Idk
Sav: LMFAOO stg doe
John Doe: This Nigga crazy, burn them shits Icey
Sav: Check clear

50.    Based upon your affiant's training and experience in this and other investigations, your affiant believes that SULLIVAN is overseeing the creation and production of business cards to advertise the drug sales location at 233 Fourth Street. Specifically, in the conversation described above between the usernames "Erica Smith" and "Skrillah Santana," SULLIVAN is speaking with HOLLEY, who he also refers to as "Shad." During the first conversation, between SULLIVAN and HOLLEY, they are talking about new business cards to advertise that 233 Fourth Street had re-opened as a drug sales location. This set of business cards is much like the business card for 441 Avenue D possessed by SULLIVAN at the time of he was arrested by the NYS Police in possession of numerous Xanax pills. SULLIVAN then has a subsequent conversation in the same timeframe with Evion Smith and tells Smith not to distribute the business cards (burn them shits) because HOLLEY put the wrong address on them. (ie., 233 First Street instead of 233 Fourth Street).

26

51.    Another group-chat conversation was observed on Telegram between the usernames "John Doe," "Billionaire Strappa," "Skkkoz GetTAnOse," "King Swazo," and "BCKEND_STRAPPA" on October 1, 2022.   "John Doe" is the username utilized by SULLIVAN and "Billionaire Strappa" is a known nickname/screen name utilized by Takir JOHNSON.  The conversation reads as follows:

From John Doe (10/1/22 at 1:21 p.m.):

**K2**
50 dubs
50 dimes
95 nicks
**Hard**
19 nicks $318 & I took 2 shorts yesterday
16 beans $70

From John Doe (10/1/22 at 1:46 p.m.):

**Morning Counts**
9am
12pm
3pm
6pm
9pm
**Night counts**
12am
4am
8am

From Billionaire Strappa (10/1/22 at 3:02 p.m.):

K2
50 dubs
50 dimes
95 nicks

Hard
15 nicks $341 & I took 2 shorts yesterday
13 beans $85

From Billionaire Strappa (10/1/22 at 9:00 p.m.):

27

K2
50 dubs
50 dimes
95 nicks
Hard
77 $64
13 beans

From King Swazo (10/2/22 at 12:07 a.m.):

K2
50 dubs
50 dimes
95 nicks
Hard
68 102$
13 beans

From King Swazo (10/2/22 at 7:30 a.m.):

K2
50 dubs
50 dimes
95 nicks
Hard
44 229$
7 beans

From King Swazo (10/2/22 at 10:04 a.m.):

K2
50 dubs
50 dimes
95 nicks
Hard
51 $190
7 beans $30

Skkkoz GetTAnOse (10/2/22 at 12:11 p.m.): Kount

52.    Based upon your affiant's training and experience in this and other

investigations, "K2" is a common name used for synthetic marijuana, "hard" is a common

28

name for crack cocaine, and pills are commonly referred to as "beans." The term "count" refers to the amount of money present and/or the amount of drugs available for sale at a drug sales location. Your affiant believes that SULLIVAN is directing Takir JOHNSON and others on how and when to report the counts to him. Furthermore, Takir JOHNSON and the other individuals receiving this direction did respond and report their counts to SULLIVAN. It is important for drug dealers to maintain an inventory to maximize profits from the sale of illegal drugs.

53.     Finally, several "Notes" were observed contained in the cellular telephone possessed by SULLIVAN. The "Notes" section on many cellular telephones is utilized for creating personalized notes and reminders. This information can be stored on the cellular telephone itself and/or on the "cloud." Specifically, SULLIVAN's "Notes" included the following notations:

     *a.* *Created on: 7/12/2022 12:22:30 PM (UTC-4)*

     *Modified on: 10/12/2022 4:11:50 PM (UTC-4)*

       Medicamentum(1005)

       Xanax
       Suboxone/pills
       Percs (fed fake)
       Feddy
       Etizolam
       Horse tranquilizer
       Katimine
       Alprazolam
       Diazepam
       Vicodin

54.     Based upon your affiant's training and experience in this and other investigations, your affiant knows that it is common practice for narcotics traffickers to

maintain an inventory of illegal drugs that are possessed for distribution. Your affiant believes that this "Note" is a list of varying types of drugs SULLIVAN and co-conspirators are selling and distributing for profit. This list includes numerous narcotics, stimulants, depressants, and hallucinogens.

55.    In another Note, the following was discovered:

      *a. Created on: 6/18/2022 3:39:55 PM (UTC-4)*

          for 4 pounds) ((9,560))

          $30 times 8 = 240 times 16 = 3,840 times by 4 = 15,360 (paid $5800 for 4 pounds) ((9,560))
          $20 times 8 = 160 times 16 = 2,560 times by 4 = 10,240 your profit
          Josh 5120 off 4 pounds

56.    Based upon your affiant's training and experience in this and other investigation, your affiant believes that this "Note" shows pricing and profit margin for purchasing four pounds of marijuana.

57.    In yet another note, the following was observed:

      *a. Created on: 6/4/2022 9:31:02 PM (UTC-4)*

      *Modified on: 6/6/2022 7:56:29 PM (UTC-4)*

          5 dubs
          5 dimes
          5 nicks
          1 $3's
          1 1/2 hold
          100 dimes
          50 dubs
          100 nicks

58.     Based upon your affiant's training and experience in this and other investigations, you affiant believes this "Note" contains information about the quantities of illegal drugs available at the time for sale, also referred to as the "count." "Dubs" refers to an amount of an illegal drug sold for $20.00, "Dimes" refers to an amount of an illegal drug sold for $10.00, and "Nicks" refers to an amount of an illegal drug sold for $5.00.

59.     In this Note, it appears to be drug ledger which makes a notation of the SULLIVAN DTO associates:

    *a.  Created on: 9/2/2022 3:14:30 PM (UTC-4)*

        Genie
        Shad
        Squop
        Strap
        Sav
        Mari owe 5 75 cash
        Lo
        Meech
        Bino
        Bop
        Dewey 50
        Jay1 40
        Top flight
        Hota
        Panda

        Dewey no duff
        Mari no duff
        Jay 1 no duff
        Meech no duff
        Hota no duff

60.     Based upon your affiant's training and experience in this and other investigations, your affiant believes that this "Note" provides a rather comprehensive list of SULLIVAN's associates.     Further, your affiant knows the term "duffle" or "duff" refers to a firearm.     In this regard, your affiant believes that SULLIVAN was noting which of these

associates was not in possession of firearm(s) at that time by indicating "no duff" by their aliases. As previously described in this affidavit, many of the aliases in this list are known aliases of SULLIVAN's associates, including co-conspirators outlined in this affidavit. As previously noted, "Shad" is an alias used by HOLLEY, "Strap" is an alias used by JOHNSON, "Lo" is an alias used by CAIN-HENRY, and "Hota" is an alias used by RIVERA.

## SURVEILLANCE OPERATIONS LINKING THE PROSPECTIVE DEFENDANT'S TO THE VARIOUS DRUG LOCATIONS

61.     Throughout the course of this investigation, the investigative team has utilized multiple methods of conducting surveillance on the described targets on a near daily basis. For example, the investigative team utilized state court ordered GPS vehicle tracking devices, court ordered cellular telephone GPS location, covert and overt cameras, as well as simple physical surveillance. The following is a summary of some of the surveillance which ties the prospective defendants to the various drug locations.

62.     Based upon the various surveillance methods described above, the investigative team has become very familiar with the daily movements and travel patterns of the prospective defendants. For example, the investigative team has observed that CAIN-HENRY, Takir JOHNSON, Shatiara WILLIAMS, Joshua RIVERA, and others routinely travel to and between 233 Fourth Street and 441 Avenue D. On a nearly daily basis, that CAIN-HENRY, JOHNSON, and RIVERA spend a significant portion of their time each day at the drug houses located at 233 Fourth Street and/or 441 Avenue D. Shatiara WILLIAMS was also observed to spend a significant amount of her daily time at 233 Fourth Street, however it is noted that WILLIAMS' presence at 233 Fourth Street stopped almost entirely

in early-November 2022. Furthermore, the investigative team has observed the actions of CAIN-HENRY and RIVERA in particular are consistent with delivering daily supplies of illegal drugs to 441 Avenue D and 233 Fourth Street.

63.     SULLIVAN has also been observed at the listed drug houses, albeit with less frequency.    For example, on September 30, 2022 at approximately 10:44 a.m., SULLIVAN was observed departing his residence with a reusable shopping bag.    He entered his black Dodge Charger, bearing New York State registration KJF7400.    According to the GPS tracker, SULLIVAN traveled to the area of Takir JOHNSON's residence at 75 Jones Avenue), where he stayed for approximately two minutes, then traveled to 233 Fourth Street, where he stayed until approximately 1:32 p.m.    During this time, at approximately 12:53 p.m., a white Chrysler (rental vehicle) was observed arriving at 233 Fourth Street.    At that time, SULLIVAN was observed standing in the driveway of 233 Fourth Street holding what appeared to be the same reusable shopping bag he departed his residence with.    The investigative team also learned that the white Chrysler was another rental vehicle rented by Garrett Dunne.

64.     On October 3, 2022, at approximately 11:00 a.m., SULLIVAN was observed leaving his residence in the black Dodge Charger, arriving at 233 Fourth Street at approximately 11:30 a.m.    SULLIVAN was at 233 Fourth Street for approximately 34 minutes before returning home.    After approximately 15 minutes, SULLIVAN was observed exiting the residence carrying 3-4 large filled black garbage bags and a re-usable shopping bag, which he put into the trunk of the black Dodge Charger.    SULLIVAN then went back into the residence and came out with a white duffle bag and departed in the black Dodge Charger.

33

The GPS/tracking device on the black Dodge Charger indicated that SULLIVAN then traveled directly to 118 Frost Avenue. [7]

65.    On November 17, 2022 at approximately 3:37 p.m., SULLIVAN was observed via surveillance camera to be sitting in a red Dodge Charger, bearing New York State registration KTY6828 [8], in the driveway of his residence. The investigative team has routinely observed SULLIVAN operating this vehicle. The black Dodge Charger, bearing New York State registration KJF7400, was also observed arriving in the driveway of the residence. During this time frame, the black Dodge Charger was also regularly being driven by HOLLEY.  In fact, this is the vehicle in which HOLLEY was stopped by the Rochester Police on December 1, 2022.

66.    SULLIVAN is then observed exiting the driver's seat of the red Dodge Charger and walking to the driver's door of the black Dodge Charger.  SULLIVAN is observed handing a whitish object to the driver of the black Dodge Charger.  SULLIVAN then returns to the red Dodge Charger and the black Dodge Charger departs. At approximately 3:43 p.m., SULLIVAN exited the red Dodge Charger and entered 5 Elmdorf Avenue.  Members of the investigative team conducted surveillance on the black Dodge Charger after this encounter and confirmed that the driver of the black Dodge Charger was HOLLEY.

_____

[7]  On August 18, 2020 and October 11, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed Orders authorizing the installation and monitoring of a GPS/Tracking Device on the black Dodge Charger bearing New York State registration KJF7400.

[8] On October 11, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed an Order authorizing the installation and monitoring of a GPS/Tracking Device on the red Dodge Charger bearing New York State registration KTY6828.

67.     Based upon your affiant's training and experience in this and other investigations, the actions taken by SULLIVAN and HOLLEY are consistent with the actions your affiant has observed other individuals take when conducting transactions of illegal drugs.

68.     Later that day, at approximately 5:59 p.m., a gray Toyota 4-Runner, bearing Massachusetts registration 1LXB72[9], was observed, via surveillance camera, arriving at 441 Avenue D.  The investigative team knows this Toyota 4-Runner to be yet another rental vehicle rented by Garrett Dunne, but regularly driven/occupied by CAIN-HENRY, RIVERA, and other members of the SULLIVAN DTO.

69.     At approximately 6:46 p.m., SULLIVAN was observed leaving his residence at 5 Elmdorf Avenue in the red Dodge Charger.  SULLIVAN then traveled to 15 Beach Street, which actually backs to N.M.'s apartment building located at the corner of Beach and St. Paul, and believed to be a stash location for the SULLIVAN DTO.  At approximately 7:00 p.m., the red Dodge Challenger is observed, via surveillance camera, slowly driving down Beach Street.  At approximately 7:04 p.m., the gray Toyota 4-Runner, bearing Massachusetts registration 1LXB72, was also observed slowly driving down Beach Street.  At approximately 7:06 p.m., SULLIVAN is observed backing the red Dodge Charger into the driveway at 15 Beach Street, where he sat.    At approximately 7:08 p.m., the Toyota 4-Runner returned briefly to 441 Avenue D briefly, before going back to 15 Beach Street.   CAIN-HENRY was

---

[9] On November 7, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed an Order authorizing the installation and monitoring of a GPS/Tracking Device on the rental vehicles being utilized by CAIN-HENRY, a Toyota 4-Runner bearing Massachusetts registration 1LXB72.

then observed approaching the front passenger door of the red Dodge Charger and handing an object into the vehicle. Both vehicles then departed.

70.     After meeting with CAIN-HENRY, SULLIVAN traveled directly to the ESL bank (located at 518 East Ridge Road) and was observed by agents at the ATM at approximately 7:22 p.m.. After departing the ESL on East Ridge Road, SULLIVAN traveled directly to his residence at 5 Elmdorf Avenue, arriving at approximately 7:50 p.m. SULLIVAN was observed sitting in the red Dodge Charger for approximately 17 minutes before departing again and traveling to another ESL branch (located at 225 Chestnut Street). SULLIVAN then traveled back to 5 Elmdorf Avenue, arriving at approximately 8:35 p.m., and entered the residence.

71.     Based upon your affiant's training and experience in this and other investigation, your affiant believes that CAIN-HENRY, who assists in controlling the operation of drug sales locations at 441 Avenue D and 233 Fourth Street, left 441 Avenue D and met with SULLIVAN to provide to provide him with U.S. Currency as proceeds from the illegal drug sales.

## ESL BANK ACCOUNTS AND REAL PROPERTY PURCHASES

72.     Pursuant to a federal grand jury subpoena, records were obtained from ESL Federal Credit Union for accounts listed in the name of Rasheem L. Sullivan of 36 Weyl Street, Rochester, NY 14621 for the time period January 2020 to August 2022. Sullivan was found to have two accounts; a Free Checking account 1377540388 and Membership Daily Dividend account 1377540396. Both accounts were opened on May 4, 2018 by Rasheem Sullivan and he is the only person listed on these accounts. These account records did not

indicate any regular direct deposits or reveal payroll check deposits that would indicate monies being deposited pursuant to a legitimate employment payroll.

73.    Relative to the Free Checking Account 1377540388, bank records revealed total deposits of approximately $74,123.54, of which cash deposits accounted for approximately $57,446.00 or 78% of these deposits. In addition to the cash deposits the account records revealed Cash App deposits of about $4,884.70, ACH deposits totaled about $4,349.84 and debit card deposits totaled about $3,443.00.

74.    Relative to the Membership Daily Dividend account 1377540396, bank records revealed total deposits of approximately $65,635.87 of which cash deposits accounted for approximately $64,895.00 or 99% of the deposits. These account records also revealed a great deal of transfers between these two accounts.

75.    In addition to the above deposits, records reveal that Rasheem SULLIVAN purchased numerous bank Cashier Checks and Money Orders during the months of January 2022 to May of 2022 several of which were purchased with cash and not reflected in the bank statements mentioned above. On January 10, 2022 SULLIVAN purchased four Cashier's Checks totaling 5,759.00 with cash. On March 21, 2022 at 1:09 pm SULLIVAN purchased a $5,000 Cashier's Check with cash and then returned to the same branch at 1:58 pm to purchase a second Cashier's Check in the amount of $5,000 with cash. On March 28, 2022 and April 11, 2022 SULLIVAN again purchased Cashier's Checks each in the amount of $5,000 using cash. These Cashier's Checks were used as partial payments on several properties located in the city of Rochester.

76.    Research through the Monroe County Clerk's Office confirmed that SULLIVAN purchased four properties in the city of Rochester between January 2022 and

37

May 2022. Records show that a deed was filed on January 12, 2022 by Rasheem SULLIVAN for the purchase of the property located at 16-18 Sherwood Avenue for the price of $10,000. On February 22, 2022 a deed was filed by SULLIVAN for the purchase of the property located at 55-61 Lill Street for the price of $40,000. On May 17, 2022 a deed was filed by SULLIVAN for the purchase of 388 Colvin Street for the purchase price of $33,000. On May 25, 2022 a deed was filed by SULLIVAN for the purchase of 25 Durgin Street for the purchase price of $38,000. The County Clerk's Office records do not reflect any mortgages/loans on these properties indicating that they were paid for in cash at the time of closing.

## EAVESDROPPING WARRANTS

77.     On October 17, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed an Order authorizing the eavesdropping upon cellular telephone instrument 585-540-6410, operating on a T-Mobile network, subscribed to a wireless subscriber, and being utilized by J.B.[10] (hereinafter "J.B.'s Phone 1").

78.     On October 17, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed an Order authorizing the eavesdropping upon cellular telephone instrument 585-530-9719, operating on a T-Mobile network, subscribed to a wireless subscriber, and being utilized by D.B. (hereinafter "D.B.'s Phone").

79.     On October 25, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed an Order authorizing the eavesdropping upon cellular

---

[10] J.B.'s full name is known to agents, but his/her name is being withheld from this affidavit because he/she is not being charged at this time.

telephone instrument 585-445-0008, operating on a T-Mobile network, subscribed to a wireless subscriber, and being utilized by J.B. (hereinafter "J.B.'s Phone 2).

80.    On October 25, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed an Order authorizing the eavesdropping upon cellular telephone instrument 585-729-9653, operating on an AT&T network, subscribed to a wireless subscriber, and being utilized by Takir JOHNSON (hereinafter "JOHNSON's Phone").

81.    On October 25, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed an Order authorizing the eavesdropping upon cellular telephone instrument 585-520-6534, operating on a AT&T network, subscribed to a wireless subscriber, and being utilized by Rasheem SULLIVAN (hereinafter "SULLIVAN's Phone".

82.    On November 1, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed an Order authorizing eavesdropping upon cellular telephone instrument 585-202-7869, an AT&T cellular telephone subscribed to a wireless subscriber, and utilized by Shatiara WILLIAMS (hereinafter "WILLIAMS' Phone").

83.    On November 1, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed an Order authorizing eavesdropping upon cellular telephone instrument 585-910-3885, a T-Mobile wireless cellular telephone subscribed to a wireless subscriber, and utilized by Mario CAIN-HENRY Jr (hereinafter "CAIN-HENRY's Phone").

84.    On November 14, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed an Order authorizing eavesdropping upon cellular telephone instrument 585-625-7944, a T-Mobile wireless cellular telephone subscribed to a wireless subscriber, and utilized by Jason RIVERA Jr (hereinafter "RIVERA's Phone").

**Relevant Intercepted Communication between JOHNSON and WILLIAMS and Surveillance of SULLIVAN on 10/26/2022**

85.    On October 26, 2022 at 3:55 p.m., an outgoing cellular telephone call on 585-729-9653, a phone utilized by Takir JOHNSON, to 585-202-7869, a cellular telephone being utilized by Shatiara WILLIAMS.  The conversation is transcribed as follows:

> Start Time:  10/26/2022 3:55:35 Hrs
> Target Number:  5857299653
> Ref Number:  37
> Direction:  Outgoing
> Associate Number:  5852027869
>
> Monitored By:  Vaughn, Mark
> Transcriber By:  Vaughn, Mark
>
> TJ – Takir Johnson
> SW – Shatiara Williams
>
> [Beginning of Conversation]
>
> SW – Hello?
> TJ – Count those dimes. The deuce drawer. The dimes.
> SW – Um, he just left. Do you want me to count it again?
> TJ – I know. Yea. Count em. Should be fifty. It should have been fifty. How many in there now?
> SW – I'm about to count em. Forty-four.
> TJ – Alright, count the nicks. There should have been ninety, nine, ninety, ninety-five, ninety-four in the nicks.
> SW – Eighty-seven. You heard me? You heard me?
> TJ – Yea, I heard you.
> SW – You want me to count the dubs too?
> TJ – How many it was?
> SW – Eighty-seven.
> TJ – There should be fifty dubs.
> SW – (Unintelligible)
> TJ – Hmm?
> SW – Fifty.
> TJ – Alright, bet.
> TJ – Alright, I'm a call you back.

40

SW – K.

[End of Conversation]

86.    Based upon your affiant's training and experience in this and other investigations, during this phone call JOHNSON is ordering WILLIAMS to give him the "count." Specifically, JOHNSON is asking for the count the amount of "dimes" (referring to a packaged amount of drugs sold for $10.00), "nicks" (referring to a packaged amount of drugs sold for $5.00), and "dubs" (referring to a packaged amount of drugs sold for $20.00). Specifically, your affiant believes that WILLIAMS is providing JOHNSON with the amount of crack cocaine and K2 at 233 Fourth Street at the time.

87.    Additionally, WILLIAMS tells JOHNSON "Um, he just left. Do you want me to count it again?" when asked by JOHNSON to provide the count. JOHNSON replied by saying "I know. Yea. Count 'em." The "he" that WILLIAMS refers to is SULLIVAN. Why? Well, at approximately 3:24 p.m., SULLIVAN was observed via surveillance camera getting picked up at his residence by Evion Smith. Smith was driving a blue Dodge Caravan, bearing New York State registration KKP2898. Information observed from data received pursuant to the court ordered GPS/Tracking Device[11] installed on the Caravan indicated that SULLIVAN was driven directly to 233 Fourth Street, arriving at approximately 3:44 p.m. At approximately 3:55 p.m., the data received pursuant to the court ordered GPS/Tracking indicated that the minivan departed 233 Fourth Street, and traveled to 441 Avenue D, arriving

---

[11] On October 20, 2022, the Honorable Victoria M. Argento, New York State Supreme Court Justice, signed an Order authorizing the installation and monitoring of a GPS/Tracking Device on the blue Dodge Caravan bearing New York State registration KKP2898.

at approximately 4:08 p.m. Based upon this surveillance and the intercepted conversation between WILLIAMS and JOHNSON, which occurred at 3:55 p.m., your affiant believes that WILLIAMS was referring to SULLIVAN when she said "he just left." Additionally, based upon WILLIAMS questioning JOHNSON's request for her to do another count, your affiant believes that SULLIVAN was present for a count that occurred inside the location prior to this intercepted conversation, and then traveled to another drug sales location located at 441 Avenue D.

88.       Subsequent surveillance revealed that SULLIVAN and Evion Smith departed 441 Avenue D at approximately 4:32 p.m., traveling to a storage unit, where they stayed for approximately 5 minutes. SULLIVAN and Evion Smith were then observed stopping at an auto parts store, before returning to 233 Fourth Street at approximately 5:24 p.m. SULLIVAN and Smith stayed at 233 Fourth Street for less than 15 minutes and then traveled back to 441 Avenue D, where they stopped for less than one minute before driving to 118 Frost Avenue. SULLIVAN and Smith stayed at 118 Frost Avenue for less than 20 minutes and Smith then dropped SULLIVAN back off at home at 5 Elmdorf Avenue.

**Intercepted Communication between JOHNSON and WILLIAMS on 10/27/2022**

89.       The next day, on October 27, 2022 at approximately 9:11 a.m., an outgoing cellular telephone call from 585-729-9653, a phone being utilized by Takir JOHNSON, was made to 585-202-7869, a phone being utilized by Shatiara WILLIAMS. In this call, JOHNSON tells WILLIAMS to get the money together from drug sales because he is about to come pick it up. The conversation is transcribed as follows:

Start Time: 10/27/22 @ 9:11 am

42

Target Number:  5857299653
Ref Number:  126
Direction:  outgoing
Associate Number:  5852027869

Monitored By:  Hickey, Ryan
Transcriber By: Steiner, Patrick

TJ- Takir Johnson
SW- Shatiara Williams
UM- Unknown male

Call Begins with unintelligible voices in background

TJ- Hello
SW- Yeah
TJ- Umm, send me how many bags, send me how, the count of the bags and
put the money together.  I'm 'bouts to pull up.  They gotta' run it outside to
him.
SW- It's still the same bags.  You remember I told you?
UM- (In background) Give me twenty dollars
TJ- Uhn uh, send it to me.
SW- Send it to you?
TJ- Yeah, and put the money in, and put the money together.  I'm 'bouts to
pull up. They gotta' run it outside to him.
SW- All right.

Call ends.

90.    On October 27, 2022 at approximately 9:17 a.m., an incoming cellular

telephone call was intercepted to 585-729-9653, a phone being utilized by Takir JOHNSON,

received from 585-202-7869, a phone being utilized by Shatiara WILLIAMS, which is

transcribed as follows:

Start Time:  10/27/2022 9:17:59 AM
Target Number:  5857299653
Ref Number:  128
Direction:  incoming
Associate Number:  5852027869

Monitored By:  Hickey, Ryan

43

Transcriber By: Vaughn, Mark

TJ – Takir Johnson
SW – Shatiara Williams

[Beginning of Conversation]

TJ – Hello?
SW – (unintelligible) came through?
TJ – Naw, ain't none of my text. I can't even send them shits now still.
(Unintelligible)
SW – I'm about to call, I'm about to call (unintelligible) and see what's up,
but, um 29 bags left. I just, I just sold three. Um, and if, can you, can you like
come sit here for like an hour or two while I got tend to Charlie and Brody for
a little while?
TJ – Yea, I'm a have to come over there anyways. I'll come over there.
SW – Alright.
TJ – Alright.

[End of Conversation]

91.    On October 27, 2022 at approximately 9:18 a.m., an incoming text message
was intercepted going to 585-729-9653, a phone being utilized by JOHNSON, from 585-202-
7869, a phone being utilized by WILLIAMS, which is transcribed as follows:

Start Time: 10/27/22 @ 0918
Target Number: 5857299653
Ref Number: 129
Direction: incoming
Associate Number: 5852027869

Monitored By: Hickey, Ryan
Transcriber By: Steiner, Patrick

32

92.    At approximately 11:22 a.m., a black Nissan, bearing New York State
registration KAX9189, was observed via surveillance camera arriving at 233 Fourth Street.
During the course of this investigation, the investigative team has observed Takir JOHNSON
driving this vehicle on a regular basis.

44

93.     Based upon your affiant's training and experience in this and other investigations, your affiant believes that WILLIAMS and JOHNSON are discussing how many bags of crack cocaine WILLIAMS has left for sale. Furthermore, WILLIAMS informs JOHNSON that she had just sold three bags. This is also in reference to the text message WILLIAMS sent to JOHNSON at that time indicating that she had 32 bags. Additionally, WILLIAMS requests that JOHNSON come to her location to "…sit here for like an hour or two…" The term "sit" refers to an individual working a shift at a drug sales location. Your affiant believes that WILLIAMS requested that JOHNSON work at the drug sales location for her while she attends to other matters and that JOHNSON agreed to do so. This is further confirmed when JOHNSON arrives briefly at 233 Fourth Street at approximately 11:22 a.m.

94.     On October 27 and October 28th, 2022, calls were intercepted between Takir Johnson and his girlfriend Jaquaija Lewis.   In the calls, Takir JOHNSON specifically references narcotics and a firearm.

> **Start Time:  10/27/2022 1:21:23 PM**
> Target Number:  5857299653
> Ref Number:  179 (0)
> Direction:  incoming
> Associate Number:  5854065125
>
>
> Monitored By:  Post, Vinney
> Transcribed By: Vaughn, Mark
>
>
> TJ – Takir Johnson
> JL – Jaquaija Lewis
> [Beginning of Conversation]
>
> TJ – Hello?
>
> JL – Did you touch my weed pills?

45

TJ – No, only the hard.

JL – Yea, I hope Duece ain't touch my shit. I'm not driving around Cameron's bag. (Unintelligible) this bitch gonna get cut to their face.

TJ – I got the hard, and put my gun in your bookbag.

JL – Ok.

[End of Conversation]


**Start Time: 10/28/22 2:49:57 PM**
Target Number: 5857299653
Ref Number: 362
Direction: incoming
Associate Number: 5854065125

Monitored By: Post, Vinney
Transcribed By: Taylor, Andrew

TJ – Takir Johnson
JL – Jaquaija Lewis

Transcription starts at: 35 seconds

TJ – I need some wigs

JL – (Unintelligible) east side cuz there's about to be (unintelligible) – (water running in the background) – What?

TJ – (Unintelligible) that's why y'all always beefing with my friend's now

JL – You know I ain't beefing with shit – I'm just trying to figure out how you (unintelligible) and you said you can't find the gun- (talking over each other) – that shit don't make sense

TJ – It was in your possession-

JL – It was in my possession (starts yelling)

TJ – Stop yelling. Let me say what I got to say. I'm not talking over you! (yelling) You too grown!

JL – Ain't too grown nothing. I know exactly where the fuck I put it and where the fuck it was.

TJ – I don't know. Fuck it.

[call ends]

## Intercepted Text Communication of CAIN-HENRY Show Relationship to "Entourage Beauty Bar" at 888 South Clinton Avenue

95.    On November 2, 2022 a series of text messages were intercepted between 585-910-3885, a T-Mobile wireless cellular telephone utilized by Mario CAIN-HENRY Jr., to cellular telephone number 585-953-0303.   The conversation reads as follows:

      a.  11/2/2022 at 1:33 p.m. – from CAIN-HENRY to 585-953-0303:

           Hey I lost my key to the shop I need a copy

      b.  11/2/2022 at 1:26 p.m. – to CAIN-HENRY from 585-953-0303:

           Okay I'll go make a copy, I'm waiting for my appointment to tell me

           what time they gonna book so I can head to the shop

      c.  11/2/2022 at 1:31 p.m. – from CAIN-HENRY to 585-953-0303:

           Ok do you know how long that's gonna b

      d.  11/2/2022 at 1:41 p.m. – to CAIN-HENRY from 585-953-0303:

           one of them said after 5 cuz she's at work

      e.  11/2/2022 at 1:26 p.m. – from CAIN-HENRY to 585-953-0303:

           why the salon closed rn? u need me to come give u the keys rn?

f.   11/2/2022 at 5:30 p.m. – to CAIN-HENRY from 585-953-0303:

    I made a copy and left It for you in the front counter

g.   11/3/2022 at 10:36 a.m. – from CAIN-HENRY to 585-953-0303:

    Good morning was the shop lights on when yu came there?

h.   11/3/2022 at 10:36 p.m. – to CAIN-HENRY from 585-953-0303:

    yesss

i.   11/3/2022 at 10:37 a.m. – to CAIN-HENRY from 585-953-0303:

    I tried to turn some of them off before I left but I forgot what switches went to what again lol.

j.   11/3/2022 at 12:30 p.m. – to CAIN-HENRY from 585-953-0303:

    couple ppl came in said they going to basement and talked to queen already

k.   11/3/2022 at 2:51 p.m. – from CAIN-HENRY to 585-953-0303:

    Thanks for the key too 🖤

l.   11/3/2022 at 2:51 p.m. – from CAIN-HENRY to 585-953-0303:

    I appreciate it I been busy lately running around so my communication been at a lack

m.   11/3/2022 at 2:54 p.m. – to CAIN-HENRY from 585-953-0303:

    You're welcomeeee, you're good

96.    A search of law enforcement database revealed that telephone number 585-957-0303 is used by A.V.[12] The website for "Entourage Beauty Bar" lists "Queen H." as the CEO. Based upon your affiant's training and experience in this and other investigations, your affiant believes that CAIN-HENRY received a key for "Entourage Beauty Bar" at 888 South Clinton Avenue so he can access the location at will.   Your affiant believes that CAIN-HENRY utilizes the location as a possible stash location to resupply 233 Fourth Street and 441 Avenue D.   See ¶¶ 37 - 40, *supra (describing RIVERA's travel to the location on November 3, 2022)*.   Your affiant knows that it is a common practice of narcotics traffickers to stash illegal drugs, firearms, and or U.S. Currency (profits from illegal drug sales) at various locations that are not directly linked to them to thwart detection by law enforcement.

## Intercepted Communication between RIVERA and CAIN-HENRY on 11/7/2022

97.    On November 7, 2022 at 10:07 a.m., an incoming cellular telephone call was intercepted on 585-910-3885, a cellular telephone being utilized by CAIN -HENRY, from 585-625-7944, a cellular telephone being utilized by RIVERA, which is transcribed as follows:

> Start Time:  11/7/2022 10:07:42 AM
> Target Number:  5859103885
> Ref Number:  427
> Direction:  incoming
> Associate Number:  5856257944
>
> Monitored By:  Post, Vinney
> Transcriber By: Vaughn, Mark
>
> Mario – Mario Cain-Henry

---

[12] A.V.'s full name is known to agents, but his/her name is being withheld from this affidavit because he/she is not being charged at this time.

JR – Jason Rivera, Jr

[Beginning of Conversation]

Mario – Yo.
JR – Yo.
Mario – What's up?
JR – Nothing.
Mario – What you doing?
JR – Same over here, still.
Mario – Why?
JR – I just got done fixing all these bags and bringing them over again.
Mario – Mm, man, you wilding on my phone. I'm about to block your ass.

[End of Conversation]

98.    This call between RIVERA and CAIN-HENRY takes place while agents believe RIVERA was actually present at 233 Fourth Street.   During the call, CAIN-HENRY asks RIVERA what he is doing.   RIVERA explains to CAIN-HENRY that he just finished "fixing all these bags and bringing them over again."   Your affiant believes RIVERA was telling CAIN-HENRY that he delivered the "bags" of drugs to the drug house at 233 Fourth Street.   RIVERA's blatant discussion on the phone causes CAIN-HENRY to become upset that RIVERA is speaking about drug activity over the phone, so much so that CAIN-HENRY admonishes RIVERA by telling him he will block his calls.

**<u>Surveillance and Intercepted Communication on 12/2/2022</u>**

99.    On December 2, 2022 at 4:04 p.m., an incoming cellular telephone call was intercepted 585-440-1724, a cellular telephone known to be utilized by CAIN-HENRY, from an unknown male.   The conversation is transcribed as follows:

Start Time:  12/2/2022 4:04:56 PM

50

Target Number:  5859103885
Ref Number:  0
Direction:  unknown
Associate Number:

Monitored By:  Minurka,Tom
Transcriber By: Minurka,Tom

MCH= Mario Cain-Henry, Jr.
UM=  Unknown Male


UM: Yo.
MCH: Yo.
UM: Hello?
MCH: Yo.
UM: Yo. What's good?
MCH: What's up?
UM: Nothin, I got thirty-six minutes left and it's booming, so….
MCH: You got six minutes left?
UM: Huh?
MCH: Three minutes? Six?
UM: Thirty-six [unintelligible]
MCH: Aight. I'll be there in a minute.
UM: Aight.
 End.


100.    Approximately one hour later, at 5:19 p.m., a vehicle was observed picking an individual up from 147 Boxart Street.  GPS/location information received from CAIN-HENRY's cellular telephone was consistent with CAIN-HENRY being in the area of 147 Boxart Street at that time.  The GPS/location information received from CAIN-HENRY's cellular telephone was then consistent with him traveling to the area of 441 Avenue D.  Your affiant believes that on this date, CAIN-HENRY received a call and was informed of the amount of drugs left to sell at 441 Avenue D, and later went to 441 Avenue where he resupplied the location.

## CONCLUSION

**WHEREFORE**, based upon the foregoing, I respectfully submit that there is probable cause to believe that between in or about January 2020 to in or about December 2022, in the City of Rochester, Western District of New York, Rasheem SULLIVAN a/k/a "Coop" (hereinafter "SULLIVAN"), Mario CAIN-HENRY Jr. a/k/a "LO" a/k/a "Love" (hereinafter "CAIN-HENRY"), Takir JOHNSON a/k/a "Strap" a/k/a "Billionaire Strappa" (hereinafter "JOHNSON"), Shatiara WILLIAMS (hereinafter "WILLIAMS"), Jason RIVERA Jr a/k/a "Hota" a/k/a "Logan" (hereinafter "RIVERA"), and Brian HOLLEY a/k/a "Shad" a/k/a "Skrilla Santana" a/k/a "Skrilla" (hereinafter "HOLLEY") and others, known and unknown, did knowingly, willfully, and unlawfully combine, conspire, and agree, together and with others, to possess with intent to distribute marijuana and synthetic marijuana (commonly referred to as "K2"), Schedule I controlled substances, as well as cocaine, methamphetamine and fentanyl, Schedule II controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(A), all in violation of title 21, United States Code, Section 846.

_____
JAMES GASHLIN
TASK FORCE OFFICER, DEA

Affidavit and Complaint submitted electronically by email
in .pdf format. Oath administered, and contents and signature,
attested to me as true and accurate telephonically pursuant to
Fed. R. Crim.P. 4.1 and 4 (d) on _14_ of December, 2022.

_____
HONORABLE MARK W. PEDERSEN
U.S. MAGISTRATE JUDGE